

FIRST JUDICIAL DISTRICT COURT
COUNTY OF SANTA FE
STATE OF NEW MEXICO

2006 MAR 29 PM 1:43

MAX W. COLL, II and CATHERINE JOYCE-COLL,
Trustees of the Residence Trust of Max W. Coll, II and
Catherine Joyce-Coll, for themselves and all others similarly situated,

   Plaintiffs,

v.                                          No. D-0101CV-2006-00689

FIRST AMERICAN TITLE COMPANY, and
its affiliates and its agents in New Mexico;
NEW MEXICO PUBLIC REGULATORY
COMMISSION; JASON MARKS, DAVID W. KING,
BEN R. LUJAN, LYNDA M. LOVEJOY, AND E. SHIRLEY BACA,
Commissioners of the Public Regulatory Commission;
NEW MEXICO DEPARTMENT OF INSURANCE; and
ERIC SERNA, Superintendent of Insurance,

   Defendants.

## CLASS ACTION COMPLAINT FOR INJUNCTION, DAMAGES, DECLARATORY AND OTHER RELIEF

1.   THE COURT HAS JURISDICTION OVER THE PARTIES.

2.   Plaintiffs Max W. Coll, II and Catherine Joyce-Coll are residents of Santa Fe County, New Mexico and Trustees of the Residence Trust of Max W. Coll, II and Catherine Joyce Coll. They bring this case on behalf of themselves and on behalf of all others similarly situated.

3.   Defendant First American Title Company is an insurance company incorporated under the laws of California, with its principal place of business in that state. First American Title is licensed and authorized by the State of New Mexico to, and does, transact the business of title insurance in New Mexico, directly and through its agents in New Mexico. These agents include local title companies that operate in various counties in New



Mexico. First American Title Insurance Company and its affiliates and agents are hereafter collectively referred to as "First American Title."

4.  Defendants New Mexico Public Regulatory Commission ("PRC"), Commissioners of the PRC Jason Marks, David W. King, Ben R. Lujan, Lynda M. Lovejoy, and E. Shirley Baca ("Commissioners"), New Mexico Department of Insurance ("Insurance Department") and Superintendent of Insurance Eric Serna ("Superintendent") (collectively hereafter "Regulators") are agencies or officials of the State of New Mexico. They are charged with obeying and carrying out the Constitution of New Mexico. The Regulators are also charged with carrying out the laws regarding insurance companies and agents, including the defendant First American Title and its agents.

5.  The Court has jurisdiction over the parties and the subject matter in this lawsuit, and venue is proper under NMSA 1978, § 38-3-1(G).

6.  **BY FIXING PRICES, DEFENDANTS HAVE FORCED PLAINTIFFS AND OTHER CONSUMERS TO PAY EXCESSIVE PRICES FOR TITLE INSURANCE THAT PROVIDES VERY LITTLE COVERAGE.**

7.  Plaintiffs purchased a title insurance policy from First American Title on or about August 15, 2003, in order to purchase their home near Santa Fe, New Mexico. They paid $2,430 for the policy. They had no choice but to buy title insurance, because title insurance is required in order to obtain mortgage financing. A copy of the title insurance policy is attached and incorporated as Exhibit 1.

8.  Plaintiffs purchased another title insurance policy from First American Title on or about September 16, 2005, when they refinanced and remodeled their home. They paid $2,407 for another title policy on the same property, plus $50 for a title binder and $75 for

endorsements. They had no choice but to buy another title insurance policy, even though they already had title insurance on their home, because title insurance is required in order to obtain mortgage refinancing. The defendants require consumers to buy duplicate title insurance every time they refinance their homes, even though they already have coverage and the underlying risks have not changed materially.

9. Plaintiffs were forced to pay excessive and unreasonable prices for their title insurance because defendants have engaged in anti-competitive price fixing, which is a combination in restraint of trade contrary to the anti-monopoly provisions of the New Mexico Constitution. *See* N.M. Const. art. IV, §§ 26 and 38, quoted below.

10. They had no choice but to pay these prices, because all of the title insurers in New Mexico charge exactly the same price for title insurance and related services. There is no competition on the price of title insurance in New Mexico.

11. All of the title insurers in New Mexico issue the same policy forms, with no significant variations in the risks insured and the risks excluded from coverage. There is no competition on the scope of title insurance coverage in New Mexico.

12. As a result, the named plaintiffs and others similarly situated have been damaged because defendants' actions forced them to pay excessive and unreasonable prices for title insurance and related services; prevented them from shopping for and obtaining competitive prices and services; and prevented them from shopping for and obtaining better insurance coverage.

13. But for the unconstitutional and illegal actions of defendants in combination in restraint of trade, the plaintiffs and others similarly situated would have been able to obtain title insurance at a substantially lower cost, and better risk coverage.

14. The prices and terms for their policy were fixed in restraint of trade by the concerted actions of defendants under the purported authority of the Title Insurance Act, NMSA 1978, §§ 59A-30-1 through -15. The defendant Regulators require all title insurance companies to charge the same rate and issue the same restricted policies, and the title insurance companies and their agents are happy to do so, because title insurers and agents share large monopoly profits from the elimination of competition on the price and the terms of the insurance they issue.

15. **DEFENDANTS HAVE DAMAGED NEW MEXICO CONSUMERS.**

16. The underlying risks of title insurance in New Mexico have decreased over time, as land titles have been quieted and settled, statutes of limitations have run, and public recording systems have improved. At the present time, the risks insured by title insurance are almost non-existent. And where actual risks are present, the defendants have acted under the Title Insurance Act to mandate policy forms which exclude most real risks from coverage.

17. The costs of issuing title policies in New Mexico have also decreased over time, due to computerization, data sharing and better public filing systems. However, defendants' actions have prevented these lower costs from creating lower costs for the consumer.

18. As a result, for every dollar in premiums that title insurers collect in New Mexico, they pay out less than 5 cents to policyholders to cover claims. The pure insurance

component of title insurance – the shifting of financial risk from the policyholder to the company – is essentially illusory.

19.     For example, in its Annual Statement filed with the New Mexico Insurance Department and regulators in other states, First American Title reported that it charged $3,448,447,000 [$3.448 billion] in premiums on policies written nationwide in 2003. On those 2003 policies, it actually paid out only $41,793,000 [$ 41.793 million] to policyholders to cover their claims, for a loss ratio of .0121 or 1.21%. In other words, First American Title paid out about 1 cent on every dollar it collected nationwide. (The exact figures for New Mexico are unknown, because First American Title does not report them separately, but they are likely to be similar.)

20.     By contrast, in other lines of insurance regulated by the Insurance Department and the PRC, where there is price competition rather than price fixing, insurance companies pay back to policyholders a much larger percentage of the premium dollars collected. For example, in automobile insurance, companies in New Mexico pay out more than 70% of the premiums they collect, to cover claims. Similarly, on health insurance, the "loss ratio" is usually in excess of 70 cents on every dollar collected in premiums.

21.     As a result of defendants' actions, consumers in New Mexico pay more for title insurance than consumers in many other states. For example, it recently cost about $1,748 to purchase title insurance on a $300,000 home in New Mexico, compared to approximately $1,069 in Colorado Springs, Colorado, and roughly $1,200 in Phoenix, Arizona.

22.     In 2004, title insurance companies in New Mexico collected approximately $111,000,000 in premiums. It is reasonable to expect that premiums would be at least 25% lower if defendants ceased their collusion and their activities in restraint of trade.

23.     **DEFENDANTS HAVE ENGAGED IN PRICE FIXING AND RESTRAINT OF TRADE CONTRARY TO THE ANTIMONOPOLY PROVISIONS OF THE NEW MEXICO CONSTITUTION.**

24.     All of the defendants are engaged in horizontal price-fixing, which is a combination in restraint of trade contrary to the New Mexico Constitution, including Article IV § 38, which provides that, "The legislature shall enact laws to prevent trusts, monopolies and combinations in restraint of trade." Despite this constitutional provision which requires the legislature to <u>prevent</u> combinations in restraint of trade, defendants have interpreted the Title Insurance Act to <u>create</u> a combination in restraint of trade, by which the defendants and all title insurance companies annually fix the prices charged for title insurance by every company in New Mexico, completely eliminating all price competition. Horizontal price fixing by competitors is a *per se* restraint of trade, which cannot be justified by the reasonableness of the prices. *State v. Ray Bell Oil Co.*, 101 N.M. 368, 683 P.2d 50 (Ct. App. 1983), *cert. denied*, 101 N.M. 362, 683 P.2d 44, *appeal dismissed*, 469 U.S. 1030 (1984).

25.     Article IV, § 38 was enacted as part of New Mexico's original constitution in 1912, during the great era of government action against trusts, monopolies and price fixing. Section 38 is modeled after the Sherman Antitrust Act of 1890, 15 U.S.C. §§ 1 through 7, which prohibits combinations, contracts and conspiracies "in restraint of trade or commerce."

26.     While the Sherman Act is merely statutory, and therefore can by changed by the federal legislature, the New Mexico Constitution of 1912 elevates the antimonopoly policies of the Sherman Act to the level of a constitutional mandate. The 1912 Constitution was written to prevent the legislature from acting in collusion with businesses seeking special privileges for monopolistic or anti-competitive purposes. Based on their own historical experience, the drafters of the New Mexico Constitution were well aware that monopolists often used their wealth and influence to exercise undue control over the legislative branch, so they included several antimonopoly provisions in the Constitution itself. For example, in the late 19th and early 20th centuries, railroads wielded monopolistic powers, so Article IV, § 37 provides that legislators forfeit their office if they accept free passage on a railroad.

27.     Another related antimonopoly provision in the New Mexico Constitution is Article IV, § 26, which provides that "The legislature shall not grant to any corporation or person, any rights, franchises, privileges, immunities or exemptions, which shall not, upon the same terms and under like conditions, inure equally to all persons or corporations; no exclusive right, franchise, privilege or immunity shall be granted by the legislature or any municipality in this state." Defendants' conduct also violates Article IV, § 26.

28.     These sections of the Constitution, like most constitutional provisions, impose limits on the actions that may be taken by the legislature or other branches of government. Because the Constitution clearly prohibits the legislature from creating monopolies or monopolistic practices through legislation, the Title Insurance Act is invalid and void insofar as it creates the very practices which the Constitution was intended to prevent, or insofar as that statute is interpreted by defendants to create a shared monopoly.

## 29. THE ANTIMONOPOLY PROVISIONS IN THE NEW MEXICO CONSTITUTION CAN BE TRACED BACK TO THE FIRST AMERICAN COLONIES.

30. The first English colonies in North America were initially constituted as monopolies granted by the Crown to private corporations: The Virginia Company, The Plymouth Company, and the Massachussetts Bay Company. These monopolies proved to be economically unworkable and politically repressive, so the colonies later emphatically rejected the concept of monopoly. During the revolutionary era, several of them incorporated prohibitions against monopolies into their state constitutions. For example, when Maryland formally established itself as a state on November 11, 1776, its Constitution and Bill of Rights declared "That monopolies are odious, contrary to the spirit of a free government, and the principles of commerce; and ought not to be suffered." Md. Const. art. XXXIX. The North Carolina Constitution of December 18, 1776 provided in Article XXIII, "That perpetuities and monopolies are contrary to the genius of a free State, and ought not to be allowed."

31. The Revolutionary Era prohibitions against monopolies were carried forward and incorporated almost verbatim into New Mexico's organic law during the very earliest days of the New Mexico Territory. In 1850 Congress passed the Organic Act Establishing the Territory of New Mexico, ch. 49, 9 Stat. 446 (1850). In 1851, the New Mexico territorial legislature enacted a Bill of Rights to set forth fundamental rights and principles, which the government shall never infringe. Act of Jul. 12, 1851, Rev. Stat. Terr. N.M. art. LV, ch. XCV, at 638-43 (1865). A copy of the 1851 Bill of Rights is attached and incorporated as

Exhibit 2.   The 1851 Bill of Rights explicitly outlaws monopolies and any laws creating them:

> Section 1.  That the general, great and essential principles of liberty and free government may be recognized and established, we declare that:
>
> * * *
>
> Sec. 17.  Perpetuities and monopolies are contrary to the genius of a free government and shall never be allowed, nor shall the law of primogeniture or entailments ever be in force in this Territory.
>
> * * *
>
> Sec. 20.  To guard against transgressions of the high powers herein delegated, we declare that everything in this "Bill of Rights" is excepted out of the power of the general government and shall forever remain inviolate; and all laws contrary thereto or to the provisions thereof shall be void.

32.   Forty years later, New Mexico joined in another wave of opposition to monopolies and monopolistic combinations, as the populist and progressive movements gained strength throughout the nation.  In furtherance of the antimonopoly clause in the 1851 Bill of Rights, the territorial legislature enacted the "Little Sherman Act" of Feb. 4, 1891, ch. 10, L. 1891, N.M. Stat. Ann. §§ 1685-87 (1915), now NMSA 1978, §§ 57-1-1 through -19, which prohibits "every contract or combination . . . to restrict trade . . . or control . . . price." The substance of this legislation was taken from the Sherman Antitrust Act of 1890, ch. 647, 26 Stat. 209 (1890), which now appears as 15 U.S.C. §§1 through 7.

33.   When New Mexico became a state, the antimonopoly provisions from 1851, 1890, and 1891 were carried forward and incorporated into the 1912 Constitution.  Using the language and concepts of the Sherman Act of 1890 and the Little Sherman Act of 1891, the 1912 Constitution elevates these antitrust policies to the level of a constitutional command, by mandating that "The legislature <u>shall</u> enact laws to <u>prevent</u> trusts, monopolies and combinations in restraint of trade."  N.M. Const. art. IV, § 38 (emphasis added).  Another

clause of the Constitution also operates to restrict the power of the legislature to create monopolies, by providing that "The legislature <u>shall not</u> grant to any corporation or person, any rights, franchises, privileges, immunities or exemptions, which <u>shall not</u>, upon the same terms and under like conditions, inure equally to all persons or corporations; <u>no</u> exclusive right, franchise, privilege or immunity shall be granted by the legislature or any municipality in this state." N.M. Const. art. IV, § 26 (emphasis added).

34. **CERTAIN PROVISIONS OF THE TITLE INSURANCE ACT ARE UNCONSTITUTIONAL AND INVALID, AS WRITTEN OR AS INTERPRETED BY DEFENDANTS.**

35. Many parts of the Title Insurance Act are valid, but certain parts of it violate the New Mexico Constitution, either as written or as interpreted and administered by defendants.

36. § 59A-30-4 is invalid insofar as it requires, or is interpreted by defendants to require, all title insurers to use the same identical policy form and charge exactly the same premium, thus engaging in horizontal price fixing, eliminating competition on prices and terms of coverage, and creating huge monopoly profits which are shared by title insurers and their agents.

37. § 59A-30-4 is also invalid insofar as it prohibits, or is interpreted by defendants to prohibit, title insurers from covering insurable risks which otherwise could be eligible for coverage in a competitive market, thus restraining or eliminating competition on the quality and scope of insurance.

38. § 59A-30-3(B), (C), and (D) are invalid insofar as they create, or are interpreted by defendants to create, a tying arrangement between title insurance and other services, such as

escrow and closing services and examining or searching titles, and prevent price competition in these services provided separately.

39.     § 59A-30-5 is invalid insofar as it requires, or is interpreted by defendants to require, all title insurers to use identical policy forms and charge exactly the same premium, thus eliminating competition on prices and terms of coverage and creating huge monopoly profits which are shared by title insurers and their agents.

40.     § 59A-30-6 is invalid insofar as it requires, or is interpreted by defendants to require, the Insurance Department and the PRC to fix the same rate to be charged by all title insurers, thus creating a horizontal price fixing scheme or combination in restraint of trade.

41.     § 59A-30-6(C) is valid insofar as it prohibits rates which are excessive, inadequate or unfairly discriminatory or unreasonable in relation to the risks insured.  However, defendants have violated this section by promulgating, fixing and charging rates which are excessive and unfairly discriminatory and unreasonable in relation to the risks insured.

42.     In many instances, when two interpretations of the statute are possible, the defendants have construed the statute to reduce competition and restrain trade, rather than construing the statute whenever possible in accordance with the constitutional policy to promote competition and prevent restraints of trade.

**43.     THE INSURANCE DEPARTMENT HAS INTERPRETED AND ADMINISTERED THE TITLE INSURANCE ACT IN A MANNER WHICH VIOLATES THE CONSTITUTION AND STATUTES OF NEW MEXICO.**

44.     The defendant Insurance Department, defendant Superintendent, and defendant PRC have interpreted and administered the foregoing provisions of the title insurance act in a manner which violates the antimonopoly provisions of the state constitution.  At the

request of title insurers, the Insurance Department and Superintendent of Insurance have added restraints of trade which are not mandated by the Title Insurance Act, preventing rather than promoting competition.

45. The defendant Insurance Department and defendant PRC have promulgated certain regulations which violate the antimonopoly provisions of the state constitution, including but not limited to, the following regulations:

46. § 13.14.3.11, NMAC, fixes commissions and underwriting fees for title insurance agents. Effective on May 1, 2000, it provides that title agents shall keep at least 78% of the gross premiums as a commission, and remit only 22% of the premium to the insurer. By contrast, in lines of insurance where agents' commissions are not fixed, agents' commissions are much lower. For automobile and homeowners' insurance, agents' commissions typically range from 12 to 15% of premium. The defendants have combined to price fix agents' commissions at an artificially high level which is unrelated to the actual services provided by agents or the cost of providing those services. Then the defendants use these artificially high commissions to justify the artificially high prices charged to consumers for the entire title policy. In New Mexico, First American Title and other title insurers write much of their insurance directly, that is, using insurance agencies which are owned by the insurance company, rather than through non-affiliated local insurance agents. Therefore, on a large part of its business, First American Title pays the 78% commission to itself. In order to rationalize the artificially high prices for title insurance, the defendants treat these retained "commissions" as if they were bona fide, arms-length expenses between unrelated parties, when they are not.

47. § 13.14.9.15 prohibits lower prices for lower risks or narrower coverage.

48. § 13.14.9.19(A) fixes the price for commitments to insure.

49. § 13.14.9.2 through .40 fix the price for policies for original owner policies, discounts for real estate subdividers, replacement policies, mortgagee policies, reissue policies, construction loans, etc.

50. § 13.14.10.1 through .46 [Part 10] fixes the price for various endorsements.

51. § 13.14.18.8 through .76 [Part 18] fixes policy forms and coverage.

52. § 13.14.18.8 and .9 prohibit title insurers from issuing broader insurance coverage even where the consumer is willing to pay an actuarially sound fee for broader coverage. The effect and purpose of these regulations is to eliminate competition among title insurers based upon the quality and scope of coverage.

53. § 13.14.9.18 fixes prices for original owner's policies.

54. The defendant Insurance Department and the defendant PRC have regulated title insurance in violation of § 59A-30-6(C), which requires that "Premium rates promulgated by the superintendent shall not be excessive, inadequate or unfairly discriminatory and shall contain an allowance permitting a profit that is not unreasonable in relation to the riskiness of the business of title insurance." The rates promulgated by the Insurance Department have been and are excessive and unfairly discriminatory. These rates permit a profit which is grossly unreasonable and excessive in relation to the riskiness of title insurance, which is minuscule.

55. Defendants Insurance Department and Superintendent have exceeded their authority under § 59A-2-9 by promulgating regulations which are unreasonable and which extend, modify or conflict with provisions of the insurance or other laws of New Mexico.

56. Because the actions of the defendants violate the Constitution and statutes and are therefore void, the anti-competitive conduct of title insurers and their agents violates other applicable New Mexico statutes, including the New Mexico Unfair Insurance Practices Act, NMSA 1978, §§ 59A-16-1 through -30; the New Mexico Antitrust Act, NMSA 1978, §§ 57-1-1 through -19; and the New Mexico Unfair Trade Practices Act, NMSA 1978, §§ 57-12-1 through -22.

57. **THIS CASE SHOULD BE MAINTAINED AS A CLASS ACTION.**

58. The defendants have treated the plaintiffs and all members of the proposed class in the same manner, committed the same violations of law toward all class members, and inflicted the same injuries on all class members. Defendants have treated the plaintiffs identically with other members of the class, by allowing no variations in prices or policy coverages among purchasers of title insurance.

59. Defendants have been unjustly enriched, at the expense of plaintiffs and other class members.

60. The claims asserted in this Complaint are properly maintainable as a class action pursuant to Rule 1-023, NMRA 2006, on behalf of the following persons (herein "the Class"): All purchasers of title insurance from First American Title or its affiliates, covering property located in New Mexico, from March 29, 2000 forward.

61. There are thousands of class members such that their joinder is impracticable.

62. The amount of damage suffered by each individual member of the class is significant to them, but not sufficient to justify the cost of litigating individual claims in separate actions.

63. There are facts common to all members of the class. These include, without limitation:

    A. Defendant First American Title has issued thousands of standardized title insurance policies to class members, which are identical or substantially identical to the plaintiffs' policy;

    B. First American Title has engaged, and continues to engage, in horizontal price fixing, a *per se* restraint of trade;

    C. All of the title insurers in New Mexico charge exactly the same price; and

    D. First American Title has treated the plaintiffs and other members of the class in an identical manner, by fixing prices and policy coverages so that plaintiffs and other members of the class have been prevented and prohibited from shopping for and buying better title insurance at a lower cost.

64. First American Title has engaged, and continues to engage, in a combination to restrain trade and prevent competition on the price of title insurance and related services. All of the title insurers in New Mexico insure the same risks, and exclude any other risks. No title insurer competes with any other title insurer on the risks that they are willing to insure.

65. First American Title has engaged, and continues to engage, in a combination to restrain trade and prevent competition in the risks insured by title policies. All of the title insurers in New Mexico insure the same risks, and exclude any other risks. No title insurer competes with any other title insurer on the risks that they are willing to insure.

66. First American Title has engaged, and continues to engage, in a combination to restrain trade and prevent competition by tying the purchase of title insurance to other services such as title searches and escrow and closing services.

67. There are questions of law common to all members of the class. These include, without limitation:

    A. Whether the above provisions of the Title Insurance Act are contrary to the New Mexico Constitution;

    B. Whether the defendants have interpreted, construed, and administered the Title Insurance Act in a manner consistent with the New Mexico Constitution and the public policies stated therein;

    C. Whether the defendants' actions as described in the Complaint have resulted in the unjust enrichment of First American Title and its agents; and

    D. Whether the defendants' actions as described in the Complaint have damaged the plaintiffs.

68. The claims of the representative plaintiffs are typical of the claims of the class members whom they seek to represent.

69. Plaintiffs will fairly and adequately protect the interests of the class which they seek to represent. There is no conflict between the interests of plaintiffs and of other members of

the class, and they are cognizant of their duties and responsibilities to the entire class. Plaintiffs' attorneys are qualified, experienced and able to conduct the proposed class action litigation.

70.     This action should proceed as a class action under Rule 1-023(B)(1), NMRA 2006, because the prosecution of separate actions by the individual members of the class would create a risk of (a) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for them and/or First American Title; or (b) adjudications with respect to individual members of the class which would, as a practical matter, be dispositive of the interests of the other members not party to the adjudication or substantially impair or impede their ability to protect their interests.

71.     This action should also proceed as a class action under Rule 1-023(B)(2), NMRA 2006 because First American Title has acted or refused to act on grounds generally applicable to the class, thereby making appropriate declaratory relief with respect to the class as a whole.

72.     This action should proceed as a class action under Rule 1-023(B)(3), NMRA 2006.

73.     The questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Additionally:

   A.     No member of the class has a substantial interest in individually controlling the prosecution of a separate action, but, if any such class member or members wish to do so, they may exclude themselves from this class upon the receipt of notice under Rule 1-023(C)(2), NMRA 2006;

B. Upon information and belief, there are no pending lawsuits of members of the class who may be similarly situated which may potentially affect the matters raised in this action;

C. It is desirable to concentrate the litigation of these claims in this forum. The determination of the claims of all class members in a single forum, and in a single proceeding, would be a fair and efficient means of resolving the issues raised in this litigation as between plaintiffs and defendants; and

D. The difficulties likely to be encountered in the management of a class action in this litigation are reasonably manageable, especially when weighed against the virtual impossibility of affording adequate relief to the members of the class through numerous separate actions.

## PRAYER FOR RELIEF

WHEREFORE, the plaintiffs respectfully ask the Court to grant all necessary and appropriate relief, including but not limited to:

A. Certifying this case as a class action under Rule 1-023(B)(1);

B. Certifying this case as a class action under Rule 1-023(B)(2);

C. Certifying this case as a class action under Rule 1-023(B)(3);

D. Enjoining the defendants from engaging in the illegal behavior set forth in this complaint;

E. Entering declaratory judgments establishing the rights and obligations of the parties with respect to the issues and disputes set forth in this complaint;

F.	Issuing appropriate writs directed to defendant Regulators, including writs of mandamus and prohibition;

G.	Awarding the plaintiffs and all members of the class damages against the defendant First American Title and its agents and others who have acted in concert with them, including actual, compensatory, punitive and statutory damages, such as provided by NMSA 1978, § 57-1-3(A); § 57-14-8(A); and § 57-12-10(B);

H.	Requiring First American Title to disgorge the amounts by which it has been unjustly enriched by its unreasonable charges and unlawful practices;

I.	Awarding plaintiffs and all class members damages against defendants for violating the plaintiffs' constitutional rights under the Constitution of the State of New Mexico;

J.	Awarding the costs of this action to plaintiffs and the members of the class;

K.	Awarding attorneys' fees as provided by the applicable statutes and law, including the statutes cited above; and

L.	Retaining continued jurisdiction over the defendants to ensure compliance with the Court's judgment and orders.

Respectfully submitted,

VICTOR R. MARSHALL & ASSOCIATES, P.C.

By _____
Victor R. Marshall
Attorneys for Plaintiffs
12509 Oakland NE
Albuquerque, New Mexico  87122
505/332-9400
505/332-3793  FAX